**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CECIL D. ROUSE,                                          Case No. 1:17-cv-716

        Plaintiff,                                   Dlott, J.
                                                        Bowman, M.J.
  v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Cecil Rouse filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents two closely related claims of error for this Court's review in his Statement of Errors. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED, because it is supported by substantial evidence in the record as a whole.

### I. Summary of Administrative Record

For more than two decades, Plaintiff, who has a high school education, worked as an ironworker and as an ornamental metalworker. Both jobs were considered "skilled" and Plaintiff performed both at the "heavy to very heavy level of exertion." (Tr. 77).

Plaintiff filed his first applications for supplemental security income ("SSI") and for disability insurance benefits ("DIB") in 2011, alleging a disability onset date of March 16, 2010 due to a combination of physical and mental impairments. Plaintiff's applications were denied initially and upon reconsideration on April 16, 2012, based upon a

1

determination that Plaintiff remained capable of performing work at the "light" exertional level, in an environment "without strict time or quota demands." (Tr. 149). Plaintiff did not further appeal that denial. (Tr. 10).

Instead, in November 2013, Plaintiff filed a new DIB application; Plaintiff did not file a corresponding new application for SSI. Plaintiff remained insured, for purposes of DIB, only through the following month, December 31, 2013. In his second DIB application, Plaintiff continued to allege a disability onset date of March 16, 2010, notwithstanding his failure to appeal the April 16, 2012 denial, which ordinarily operates as administrative res judicata through the date of that adverse determination. After Plaintiff's second DIB application was also denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an ALJ.

On April 13, 2016, Plaintiff appeared with counsel and gave testimony before ALJ Andrew Gollin; a vocational expert also testified. (Tr. 44-82). The ALJ reminded Plaintiff and his attorney that he could not ordinarily consider the alleged onset date of March 2010 due to the prior adverse decision of April 16, 2012 and inquired if counsel could state any basis that would represent good cause for reopening the prior application in support of the earlier alleged onset date. (Tr. 48). Although counsel stated she was "unable to cite an authority at this time," she filed a post-hearing brief in which she maintained that Plaintiff's second DIB application "contained an implied request for reopening," based solely on Plaintiff's reference to the March 16, 2010 date without acknowledgment of the prior adverse decision. (Tr. 364, hearing brief, emphasis added). Through counsel, Plaintiff further argues that his "implied" request must have been considered since the adverse reconsideration decision on his second DIB application references the same alleged onset date of March 16, 2010 rather than April 16, 2012, the

denial date of his earlier application. (*See* Tr. 166). In addition, Plaintiff argued in his post-hearing brief that he had "good cause" for reopening the prior claim, in the form of "new and material" evidence. (Tr. 364). Specifically, Plaintiff relies on two medical source statements from his cardiologist and from his primary care physician, both of which are dated in 2014. (Tr. 365). Last, Plaintiff argued that "good cause" existed because "a request for hearing [before an ALJ] was never filed by his prior attorney." (Tr. 365).

Notably, Plaintiff's evidentiary hearing on his current DIB application did not take place until more than two years after his Date Last Insured ("DLI"). There is no dispute that after Plaintiff's DLI, his impairments became much more severe, including but not limited to a broken neck. (Tr. 49). However, because Plaintiff was required to prove that he suffered from a disability prior to December 31, 2013, the ALJ repeatedly advised Plaintiff that medical evidence prior to his DLI was the most relevant and significant. (Tr. 50-52). On June 1, 2016, the ALJ issued an adverse written decision, concluding that Plaintiff was not disabled prior to his DLI. (Tr. 20-34). In his decision, the ALJ concluded that "the possibility of reopening the claimant's prior application is not presented because, after consideration of all evidence of record, the claimant is not found to have been disabled at any time between March 16, 2010 – the current and previous alleged onset date – and December 31, 2013, his date last insured." (Tr. 10).

Plaintiff was 45 years old on his alleged onset date and had just turned 49 (still a "younger individual") on his DLI. (Tr. 22). He has a high school education, and during the relevant periods of time, lived with his wife and one of his two sons. (Tr. 654, 887). Plaintiff testified that he quit working after a heart attack in 2010. Prior to his DLI, Plaintiff had severe impairments of congestive heart failure, left bundle branch block, coronary artery disease, diabetes mellitus with neuropathy, degenerative disc disease of the

3

cervical and lumbar spine, prior cervical spine fusion surgery, hypertension, hyperlipidemia, depression, and anxiety. (Tr. 12). Plaintiff does not dispute the ALJ's determination that none of his impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability. (Tr. 14).

Clearly, Plaintiff was not capable of performing the type of heavy exertional work that he had spent decades doing. However, through his DLI, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a restricted range of sedentary work, subject to the following additional limitations:

> (H)e had to be able to make position changes between sitting, standing, and walking while at the workstation for up to five minutes per hour. The claimant could do no more than occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling, and crawling. He was limited to no work involving concentrated exposure to extreme cold, extreme heat, and/or humidity, and to no work involving concentrated exposure to fumes, odors, dust, gases, pulmonary irritants, and/or poor ventilation. The claimant was limited to no work involving hazardous machinery or equipment and no work involving unprotected heights. He was limited to being able to understand, remember, and carry out instructions involving simple and routine tasks that do not require a fast-paced production rate and do not involve strict production rates or quotas. The claimant was limited to no more than occasional simple work-related decisions, and to no more than occasional changes in workplace settings and workplace duties. He was limited to no more than occasional interaction with the general public, coworkers, and supervisors, and to jobs that allow for up to 10% off task time.

(Tr. 17).

Considering Plaintiff's age, education, and RFC, and based on testimony from the vocational expert, the ALJ determined that Plaintiff could still perform a significant number of jobs in the national economy, including the representative jobs of paramutual ticket checker, document preparer, and addresser. (Tr. 23). Therefore, the ALJ determined

that Plaintiff was not under a disability.  The Appeals Council denied further review, leaving the ALJ's decision as the final decision of the Commissioner.

In the Statement of Errors filed on appeal to this Court, Plaintiff argues that the ALJ erred by failing to give controlling weight to the RFC and/or disability opinions expressed by two treating physicians.  In a closely related claim, Plaintiff contends that the ALJ's decision is not supported by substantial evidence.   Neither claim is persuasive.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability."  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.   42 U.S.C. § 405(g).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).   In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

## B. The ALJ's Decision is Supported by Substantial Evidence

Plaintiff argues that the ALJ's decision should be reversed because the ALJ failed to give controlling weight to the opinions of two treating physicians. In a closely related

claim, Plaintiff maintains that the failure to accept those opinions led to the ALJ's RFC and non-disability decisions not being supported by substantial evidence in the record as a whole. I find no error, and instead conclude that the RFC as determined and – ultimately, the non-disability decision - are substantially supported.

In addition to two closely related claims presented in his Statement of Errors, Plaintiff raises several entirely new claims in his reply memorandum. I find the latter claims to be inappropriately raised and recommend their denial on procedural grounds.

### 1.  Evaluation of Two Treating Physicians

Until March 27, 2017, the Social Security Agency had established an "automatic hierarchy for treating sources, examining sources, ...[and] nonexamining sources," with the opinion of treating sources automatically entitled to the greatest weight. *See* 82 FR 5844-01, 5853, 2017 WL 168819 (Jan. 18, 2017). Thus, the long-standing regulation regarding treating physicians provided: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it <u>controlling</u> weight." 20 C.F.R. §404.1527(c)(2) (emphasis added); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p. The Commissioner also was required to provide "good reasons" if the Commissioner did not give controlling weight to the opinion of a treating physician. *Id.*

Effective March 27, 2017, many long-standing regulations have been significantly revised or rescinded, with the old hierarchy discarded. For example, a new rule set forth in 20 C.F.R. §404.1520c entirely replaces the treating physician rule previously set forth in 20 C.F.R. § 404.1527. On September 11, 2017, the Appeals Council declined further

review under "the regulations and rulings in effect as of the date we took this action." (Tr. 1). Thus, this Court first must briefly examine whether the treating physician rule applies to Plaintiff's claim. Although some revisions apply to claims that remained pending at the administrative level on March 27, 2017, the Commissioner has made clear that the elimination of the treating physician rule applies only to "claims filed on or after March 27, 2017." *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. at 5845. Plaintiff filed the instant claim in November 2013; therefore, the prior "treating physician rule" and related SSRs and case law continue to apply to this case. *Accord, Glanz v. Com'r of Soc. Sec.*, 2018 WL 3722318 at n. 5 (N.D. Ohio July 17, 2018). Having determined that the well-established rule remains applicable, I turn to the ALJ's analysis of the opinions of Drs. Reed and Khodadad.

The ALJ's evaluation of the two referenced opinions is supported by substantial evidence in the record as a whole. A treating physician's opinions are entitled to controlling weight, but only if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). In the ALJ's analysis, he explained why he believed that neither Dr. Reed's nor Dr. Khodadad's opinions were entitled to controlling weight – because neither treating source's opinions were well-supported by their own treatment records, and both of their extreme limitations were inconsistent with the majority of the record as a whole.

### a. Dr. Reed

Dr. Reed was Plaintiff's treating cardiologist. He first saw Plaintiff on March 16, 2010, the alleged disability onset date. On that date, he reported a several-year history of "very mild" shortness of breath but also "excellent exertion tolerance and no other

cardiopulmonary symptoms." (Tr. 505). A stress test the next day showed left ventricular chamber dilatation and an ejection fraction of only 20 percent, but no ischemia. (Tr. 483). At a follow-up with Dr. Reed in April 2010, Plaintiff reported "[r]elatively easy fatigability" and shortness of breath on exertion, but Dr. Reed noted mostly normal findings and no swelling of the feet or ankles. (Tr. 476). By late June 2010, Plaintiff's estimated fraction had improved to 33 percent. Dr. Reed opined at the time that he could not return to his prior heavy exertional work as "an Iron Worker or as any other type of Building Trades Craftsman" but said nothing of other types of work. (Tr. 474). On June 29, 2010, Plaintiff underwent placement of a pacemaker/defibrillator, (Tr. 519-520), after which his cardiac condition continued to improve. (*See* Tr. 480, 481, 628).

At a visit to his primary care physician, Dr. Khodadad, in January 2011, Plaintiff reported he was back to his baseline exertional shortness of breath and reported otherwise feeling well but requested a letter to support disability as an iron worker. (Tr. 569). On exam, Dr. Khodadad found normal heart sounds and respiratory effort and no swelling on examination. (Tr. 559-571). The next day, Dr. Kodadad opined that Plaintiff was unable to return to his Iron Worker job. (Tr. 623).

At a cardiology follow-up in February 2011, Dr. Reed noted that Plaintiff's cardiac condition was improved to "New York Heart Association class II with easy fatigability, but *no edema*, orthopnea, PND or chest pain and *only fairly minimal*" shortness of breath on exertion. (Tr. 626, emphasis added). Four months after that relatively rosy cardiology visit, in June 2011, Plaintiff went to the emergency room with a report of palpitations and shortness of breath. He was admitted for a two-day hospital stay secondary to his extremely elevated blood sugar level and was diagnosed with new onset diabetes mellitus. (Tr. 683, 688-89). Chest x-rays showed no acute abnormalities, and a consulting

9

cardiologist noted normal findings and concluded that Plaintiff's symptoms had been caused by his newly diagnosed diabetes, with no additional heart medication required. (Tr. 679, 686).

Despite Plaintiff's gradual cardiac improvement, and consistent with his June 2010 letter, Dr. Reed opined on October 28, 2011 (prior to the first adverse DIB decision) that Plaintiff remained unable to return to his prior work:

> Cecil Rouse has had additional recent evaluation of his cardiomyopathy. His *echocardiogram has shown significant improvement in LV function* but he wants exercise testing for determination of exertion tolerance on October 21, 2011. A copy of the result is included but reveals that he is able to only walk one minute on a standard Bruce protocol to a peak heart rate of 108 before exercise [] needs to be terminated due to severe fatigue and dyspnea [shortness of breath]. This would suggest he is still extremely limited and unable to return to work in any meaningful capacity *at present*.

(Tr. 691, emphasis added; *compare* Tr. 474).

The referenced attached test results reflect that Plaintiff requested that the exercise stress test be stopped almost immediately after it began due to his shortness of breath and audible wheezing, despite "only achiev[ing] 60% of [his] maximum predicted heart rate." (Tr. 692). He recovered quickly upon stopping. (Tr. 663). The supervising physician recommended "another method of stress testing with imaging modality" be utilized due to the inability to interpret Plaintiff's EKG and need to stop the test prior to Plaintiff achieving his maximum heart rate. (Tr. 692). It does not appear that any additional method of stress test was performed. Dr. Reed's records reflect that by October 2011, Plaintiff's ejection fraction rate had improved to "55-60% with no diastolic dysfunction or valvular abnormality" despite the continuation of "significantly improved" but still "moderate exertional dyspnea." (Tr. 694).

As of March 13, 2012, Dr. Reed diagnosed Plaintiff with stable morbid obesity, chronic left bundle-branch block, a history of left ventricular systolic dysfunction which

was deemed "*resolved*, on medical therapy" but remained classified under New York Heart Association guidelines as "Class II based on dyspnea, *which appears noncardiac.*"[1] (Tr. 694, emphasis added). Plaintiff also was noted to have poorly controlled diabetes, hyperlipidemia, and a prior history of chest pain "with normal coronary angiogram." Dr. Reed noted no change was required in Plaintiff's cardiac medications, but recommended that Plaintiff pursue a "possible pulmonary evaluation" to determine the cause of his exertional shortness of breath,[2] and continue the "respiratory medications started by PCP [primary care practitioner]." (Tr. 695).

In January 2011, shortly after the expiration of Plaintiff's DLI, Plaintiff's counsel asked Dr. Reed to complete a check-box style Medical Source Statement form offering opinions concerning Plaintiff's limitations. During an examination on January 27, 2011, Plaintiff reported "some occasional" swelling in his feet and only "some exertional fatigue and weakness but no significant" shortness of breath. Dr. Reed assessed Plaintiff as "stable from a cardiac standpoint" with a history of cardiomyopathy with "resolved severe LV systolic dysfunction but persistent diastolic dysfunction" classified as New York Heart Association FC II. (Tr. 878). Despite cardiac stability that required no changes to medications and minimal annual follow-up,[3] Dr. Reed noted that Plaintiff continued to have limitations that Dr. Reed attributed primarily to poorly controlled diabetes. (Tr. 873-875). Dr. Reed indicated that Plaintiff suffers from weakness, exertional dyspnea, exercise intolerance, and chronic fatigue, along with "[c]urrent diabetic neuropathy and

---

[1]Dyspnea typically refers to labored breathing and/or shortness of breath.
[2]Subsequent pulmonary function testing yielded values within normal limits. (Tr. 14).
[3]The record reflects that Plaintiff returned to Dr. Reed in July 2014 with a report of having had a few days of shortness of breath the prior month that resolved spontaneously. Examination findings were normal at that time except for abnormal split second heart sound ("S2"), and Dr. Reed again assessed Plaintiff as "stable from a cardiac standpoint" and at either a NYHA Class I (defined as "No limitation of physical activity") or Class II. (Tr. 900-901).

abdominal pain." (Tr. 878). He noted that Plaintiff's cardiac medications have no obvious side effects, and that stress is "not a large contributor" to Plaintiff's cardiac condition. Nevertheless, Dr. Reed opined that Plaintiff is incapable of even "low stress" work due to his "poor exertion tolerance per treadmill test." (*Id.*)

Dr. Reed opined that Plaintiff can walk less than 1 block, that he would need unscheduled breaks to lie down or sit quietly for variable periods throughout the day and could sit for "less than 2 hours" total in an 8-hour day. Dr. Reed did not opine on Plaintiff's ability (or inability) to stand/walk. (Tr. 879). However, he did opine that Plaintiff requires to elevate his legs to waist high level 10-20% of the day due to "edema." (Tr. 880). He opined that Plaintiff cannot lift or carry 10 pounds, can never crouch/squat or climb ladders, and can only rarely stoop/bend or climb stairs. (Tr. 880). In addition, Dr. Reed indicated that Plaintiff must "avoid even moderate exposure" and "avoid all exposure" to numerous environmental conditions. (Tr. 880). Last, he opined that Plaintiff would be "off task" for more than 25% of any workday and would be absent from work more than four days per month. (Tr. 881).

The ALJ determined that Dr. Reed's opinions were not entitled to controlling weight under applicable regulations because they were not well-supported and were inconsistent with other substantial evidence in the record, including in Dr. Reed's own records. Overall, the ALJ gave Dr. Reed's October 2011 and January 2014 opinions little weight, despite the fact that he was a treating physician who had examined Plaintiff "over the course of several years." (Tr. 19).

Among the inconsistencies and lack of support noted, Dr. Reed had reported to Plaintiff's primary care physician that an echocardiogram performed October 2011 had shown complete normalization of Plaintiff's ejection fraction rate, and that Plaintiff looked

good in a recent office visit despite his complaints of continued shortness of breath.  Dr.

Reed did not believe that there was any cardiac explanation for Plaintiff's exertional

dyspnea.  (Tr. 14).  The ALJ also explained that his October 2011 assessment "contains

only one specific laboratory finding," referring to the truncated treadmill stress test, which

could not be properly interpreted from a cardiac standpoint.  (Tr. 19).  The ALJ further

discussed Dr. Reed's opinion that Plaintiff was disabled from all work.  As explained by

the ALJ, Dr. Reed's

> conclusion that the claimant was "extremely limited and unable to return to
> work in any meaningful capacity" provides no function by function analysis
> and therefore cannot be applied to a determination of functional capability.
> It is only supportive of the determination that at that time the claimant had
> a physical impairment producing measured walking limitations.

(*Id*).

The ALJ also pointed out multiple inconsistencies in Dr. Reed's later January 2014

assessment:

> [It] contains very few references to specific findings, and it provides very
> little detailed explanation to support the indicated limitations.  A review of
> the treatment notes shows that the claimant had complaints of shortness of
> breath and fatigue, but experienced improvement of those complaints as of
> late 2012.  Specifically, the medical record of subsequent office visits
> documents the claimant's acknowledgment of improvement both in his
> cardiac conditions, which are consistently referred to as stable, and his
> diabetic conditions.  In fact, in an office note in January 2014 it was
> specifically noted that after a BiV-ICD [pacemaker] was placed in June
> 2010, the claimant's left ventricular ejection fraction had improved 55% as
> of late 2011.  His device check at that time showed no arrhythmia and only
> a very transient elevation in the Optival thresholds as of November 2013.
> The claimant reported having some occasional pedal edema and some
> exertional fatigue and weakness, but no significant dyspnea nor any
> palpations, chest pain, or syncope (Exhibit 20F, p. 3).  Similar findings were
> made in additional follow-up six months later.  (Exhibit 24F, pp. 2-8).  To the
> extent that the January 2014 opinion of Dr. Reed is credited, it supports the
> determination that the claimant was limited to performing work within the
> sedentary exertional range during the time period being considered.  For
> the reasons stated above, no weight is given to his expressed opinion
> concerning the amount of time that the claimant would be expected to be
> off task, the number of times he would be absent from work, his need for

leg elevation, or the expectation that he would be unable to work an eight-hour day.

(Tr. 20).

In his Statement of Errors, Plaintiff argues that Dr. Reed's disabling RFC opinions were consistent with those of Dr. Khodadad. However, consistency between two treating physician opinions is not determinative where neither of those opinions is well-supported or consistent with other substantial evidence in the record as a whole.

Although Plaintiff also contends that Dr. Reed's opinion is consistent with the record as a whole, he cites only a handful of records to support greater limitations, relying mostly on vague references to "test results as well as office notes" in the extensive administrative record. (Doc. 10 at 4). The undersigned has closely examined all specific page refences cited by Plaintiff and concludes that none (individually or in combination) support the extreme limitations offered by either treating physician. Most of the cited records provide little more than diagnostic information, while other records favor the ALJ's analysis. (*See, e.g.*, Tr. 659, noting Plaintiff's report that his blood sugars were fairly well controlled; Tr. 694, discussing Plaintiff's normalized ejection refraction rate and significantly improved exercise dyspnea). In any event, the fact that there may be substantial evidence to support a different conclusion does not require reversal of an ALJ's decision, so long as the non-disability decision is also substantially supported as it is here.

Plaintiff maintains that Dr. Reed's otherwise conclusory October 2011 opinion is bolstered by the functional limitation opinions that he expressed more than two years later, when he completed the January 2014 form. Plaintiff asserts that there is no regulatory requirement that "the support for opinions be contained within the same document as the opinion." (Doc. 10 at 3-4). Even if this Court were to accept the

14

remarkable proposition that an opinion letter could be "well-supported" by a function-by-function assessment dated more than two years later, however, the January RFC opinions do not shore up Dr. Reed's October 2011 opinions because the 2014 opinions also are not well-supported and are inconsistent with Dr. Reed's own treatment notes. The ALJ articulated "good reasons" for his rejection of both 2011 and 2014 opinions. In his analysis, the ALJ discussed specific inconsistencies such as the lack of edema in clinical records at a level that would support the need to elevate Plaintiff's legs to waist height for at least two hours during the work day.[4]  Therefore, the ALJ's determination that Dr. Reed's opinions were entitled to "little weight" is substantially supported.

### b. Dr. Khodadad

Dr. Khodadad, Plaintiff's primary care physician, treated him for more than 20 years.  In January 2011, Dr. Khodadad wrote a letter noting the lengthy treatment relationship and referencing Plaintiff's debilitating Congestive Heart Failure.  Noting Plaintiff's past work as an ironworker, Dr. Khodadad opined that "[d]ue to the very physically demanding nature of his occupation, it's my opinion that he currently cannot return to work." (Tr. 623).  Dr. Khodadad went on to predict that "barring a dramatic recovery" he did not believe that Plaintiff would ever return to his work.  (*Id.*)

The ALJ gave only "partial weight" to Dr. Khodadad's 2011 assessment because it was not well-supported.  Specifically, Dr. Khodadad "did not make any attempt at describing functional restrictions," or "address the possibility of the claimant doing work other than his previous heavy work as an iron worker."  (Tr. 18).  Therefore, the ALJ

---

[4]Dr. Reed frequently found no edema and Plaintiff reported only occasional pedal edema.

credited the opinion only insofar as it confirmed that Plaintiff was unable to return to his past relevant work.

On April 23, 2014, Plaintiff told Dr. Khodadad that his diabetes was stable and reported that he was exercising weekly; examination produced normal findings. (Tr. 1514, 1517). The following day, more than two years after his first opinion and nearly four months after the expiration of Plaintiff's insured status, Dr. Khodadad completed a Physical Residual Functional Capacity form. On that form, Dr. Khodadad listed a diagnostic "history of" cardiomyopathy, and uncontrolled diabetes with a clinical finding of associated neuropathy. (Tr. 891). As a result of those conditions, Dr. Khodadad opined that Plaintiff could

> rarely lift or carry less than 5 pounds and cannot walk one city block or climb steps without use of a handrail. He stated that the claimant must lie down or recline two hours at one time before needing to sit up, stand up, or walk around, and that he needs to lie down two hours in an eight-hour work day. Dr. Khodadad reported that the claimant can only sit or stand and walk about two hours each in an eight-hour work day and would need a 20-minute break from work every one to two hours with a need to lie down or si[t] quietly during the breaks. He stated that with prolonged sitting the claimant's legs should be elevated waist high 10 to 20% of the time. Dr. Khodadad stated that the claimant would frequently experience stress during the day severe enough to interfere with the attention and concentration needed to perform simple work tasks. He stated that the claimant would be "off task" for 20 % of an eight-hour work day, is likely to be absent from work four days per month and is likely to be unable to complete an eight-hour work day four days per month as a result of his physical or mental impairments. Dr. Khodadad stated that the claimant could be expected to perform full-time work at an efficiency level of 50% or less compared to an average worker.

(Tr. 18, citing Tr. 891-894).

The ALJ acknowledged Dr. Khodadad's status as a primary care physician but rejected his RFC opinions because they were not well-supported.

> [H]is April 2014 assessment of the claimant's functional capabilities contains very few references to specific findings, and provides very little detailed explanation to support the indicated limitations. A review of the

16

treatment notes shows that the claimant had complaints of shortness of breath and fatigue, but experienced improvement of those complaints as of late 2012. To the extent that his indicated limitations are credited, the opinion of Dr. Khodadad is accommodated by finding that on and prior to December 31, 2013, the claimant was limited to performing work within the sedentary exertional range. For the reasons previously stated, no weight is given to his expressed opinion concerning the amount of time that the claimant would be expected to be off task, the number of minutes he would be absent from work, his need for leg elevation, or the expectation that he would be unable to work an eight hour day.

(Tr. 18-19). Having examined Dr. Khodadad's records as well as the record as a whole, the undersigned finds the ALJ's analysis of his opinions to be reasonable.

## 2. The ALJ's RFC Determination is Substantially Supported

Plaintiff's closely related second claim of error is that the ALJ's overall RFC determination was not substantially supported, in part allegedly because the "sedentary" exertional capacity did not rely on a single medical source but instead was derived from a compilation of the record as a whole. He argues that the RFC as determined was based on "partial weight" being given "to a number of sources in order to come to a conclusion that differed from any of those sources." (Doc. 10 at 5). As explained below, Plaintiff is mistaken insofar as the agency physicians suggested an RFC that was entirely consistent with the sedentary exertional level found by the ALJ. In any event, the ALJ's RFC determination need not rest on a single medical opinion, as the RFC determination is not to be determined by a physician, but instead is reserved to the Commissioner. *See* 42 U.S.C. § 423(d)(5)(B), 20 C.F.R. § 1546(c); *see also Coldiron v. Com'r*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) (holding that ALJ did not impermissibly act as a medical expert by rendering a sedentary work RFC). Here, the ALJ did not "play doctor" but provided a well-reasoned basis for the RFC determination.

The record presented reflects that the (unappealed) denial of Plaintiff's first DIB application rested in part on a determination that Plaintiff retained the RFC to perform

work at the "light" exertional level with very few additional limitations. In response to Plaintiff's second DIB application, the agency consulting physicians and psychologists reviewed additional records and assessed an RFC that was largely consistent with the "sedentary" determination made by the ALJ in this case,[5] with additional non-exertional limitations. (*See* Tr. 142-143, July 27, 2014 opinions of Steve McKee, M.D). The reviewing physicians specifically opined that Plaintiff could stand and/or walk for 4 hours and sit for about 6 hours in an 8-hour workday, with unlimited abilities to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally, with added postural and environmental limitations. (*See* Tr. 123-124, February 6, 2014 opinions of Venkatachaia Sreenivas, M.D.). The ALJ gave those consulting opinions "partial" weight based upon his review of the record as a whole.[6] (Tr. 20).

It is worth pointing out that, in the course of evaluating Plaintiff's psychological conditions, the ALJ found only mild restrictions in Plaintiff's activities of daily living, and included some reference to his physical capabilities. For example, at a consultative exam in February 2014, two months after his DLI, Plaintiff reported that he woke up each morning to drive his wife to work and then returned home to do household chores, such as washing dishes, cleaning the floor, or (rarely) laundry. He stated that he "is good for about 10 minutes" and takes a long time to complete chores. (Tr. 15, citing Tr. 887). At

_____

[5]Although Plaintiff refers to the agency reviewing physicians as opining that Plaintiff could perform work at the "light" exertional level in response to his second DIB application, that is not entirely accurate. Although the weight restrictions were consistent with light work, postural limitations further reduced Plaintiff to the sedentary level. *See* 20 C.F.R. § 404.1567. In addition, Dr. McKee specifically limited Plaintiff to sedentary unskilled work. (Tr. 142).

[6]Plaintiff complains that the two agency consultants did not have access to his complete records, and therefore should not have been accorded even "partial" weight. But both consultants had access to significant pre-DLI records, and on reconsideration, Dr. McKee specifically addressed the additional post-DLI opinions of Dr. Reed. It is true that the record suggests the absence of records from Good Samaritan Hospital and from Dr. Khodadad at the time of the consultants' review. (*See* Tr. 134, 139). However, the ALJ gave the agency consulting opinions only "partial" weight in formulating Plaintiff's RFC, and the ALJ himself discussed all relevant medical records.

18

that time, he accompanied his wife to grocery shop but reported he could probably do it on his own, and he attended to his own hygiene. (*Id.*) At that time, he watched television, read, and used the computer, and would get together with friends to "hang out and listen to music, usually in the summer." (Tr. 15, 888). Plaintiff does not present any challenge to the ALJ's determination that he had only mild restrictions in his activities of daily living.

Also relevant is the ALJ's credibility assessment, which Plaintiff does not here challenge. The ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are only partially consistent with and supported by the medical evidence and other evidence in the record." (Tr. 17). Specifically, the ALJ noted that

> treatment notes from mid-2012 forward reflect improvement in the claimant's cardiac conditions. Moreover, although the claimant continues to experience some shortness of breath and fatigue, he testified that he also continues to smoke up to a pack of cigarettes per day. An individual who is experiencing the significant shortness of breath described in the claimant's testimony would be expected to take all available steps to alleviate that breathing problem, and the fact that the claimant continues to smoke is therefore inconsistent with his allegation of debilitating shortness of breath. The record confirms that the claimant is taking a number of medications…. However, it also establishes that these medications have stabilized the claimant's cardiac condition and significantly helped his diabetes.

(Tr. 17). The ALJ noted other inconsistencies, such as Plaintiff's testimony that stress has a lot to do with his shortness of breath, as contrasted with Dr. Reed's report that stress was not a large contributor to Plaintiff's cardiac symptoms. (Tr. 18).

"Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question," as long as the hypothetical question accurately portrays the actual limitations of the Plaintiff. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). The RFC determined by the ALJ in this case is substantially supported by the record as a whole. By contrast, there

is virtually no evidence, outside of the wholly unsupported physician statements, to support any of the additional extreme functional limitations that Plaintiff proposes. *Accord Sorrell v. Com'r of Soc. Sec.*, 656 Fed. Appx. 162, 170 (6th Cir. 2016) ("the ALJ was not required to include a limitation for elevating legs in the RFC because, although there were some treatment records that mentioned leg elevation as a treatment for edema, no physician indicated that Sorrell's edema caused work-related limitations, and no medical expert opined that Sorrell would need to elevate her feet to waist level during the workday or even every day"); *see also Foster v. Bowen*, 853 F.2d 483, 489 (6th Cir. 1988) (diagnosis of impairment not enough, claimant must establish not only the existence of a medically-diagnosed impairment, she must also prove its severity and functional impact).

Because the RFC accurately reflected Plaintiff's limitations prior to his DLI, the ALJ's non-disability decision should be affirmed.

### 3. Improper Presentation of New Claims of Error

In his reply memorandum, Plaintiff appears to present several new claims of error. New claims may not be presented for the first time in a reply memorandum; therefore, the undersigned believes little (if any) discussion of these claims is appropriate. However, in the event that a reviewing court would disagree, the undersigned will briefly discuss the newly presented claims.

First, Plaintiff asserts that the ALJ "ignored" evidence relating to the second half of his alleged disability period, from his alleged onset date of March 16, 2010 until the middle of 2012. (*See* Doc. 13 at 1). In support of this argument, Plaintiff cites records that were not cited in his Statement of Errors, primarily concerning his initial onset of symptoms in 2010 and placement of a pacemaker. The ALJ did not "ignore" the referenced evidence but elected not to discuss it because he found no basis for reopening the prior adverse

decision, dated April 16, 2012. Therefore, the ALJ properly focused on records after that date. In any event, as Plaintiff concedes, his cardiac condition had improved significantly by January 2011 with easy fatigability but only mild dyspnea on exertion. (Tr. 626). Thus, even If considered, the earlier records are insufficient to show a closed period of disability.

Second, Plaintiff asserts that the period from which the ALJ considered records from Drs. Reed and Khodadad is "notable because it was a period during which the claimant was unable to access regular medical treatment." (Doc. 13 at 2). No citation is provided for this statement, nor does Plaintiff suggest a basis for his new assertion that he lacked "access" to medical treatment.

Third, Plaintiff cites office notes from Dr. Khodadad relating to his allegedly uncontrolled diabetes and neuropathy prior to his DLI to support Plaintiff's pain complaints and the opinion that he should elevate his legs. Again, the cited records and argument were not included in the Statement of Errors. Nevertheless, the undersigned cannot agree that the referenced records are sufficient to undermine the ALJ's analysis of Dr. Khodadad's opinion on this issue. As stated, the ALJ's RFC determination is well supported. On the whole, Plaintiff's records (at most) show only occasional pedal edema. The fact that Plaintiff can point to a few notes to provide modest support for greater limitations does not justify overturning the ALJ's substantially supported decision in this case. *See Felisky v. Bowen*, 35 F.3d at 1035.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

/s Stephanie K. Bowman
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

CECIL D. ROUSE,                                                      Case No. 1:17-cv-716

        Plaintiff,                                              Dlott, J.
                                                                              Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).